No. 16-14800-CC

In the
# United States Court of Appeals
# for the Eleventh Circuit

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

AARON RICHARDSON,

*Defendant-Appellant*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
NO. 3:13-CR-177-J-LSC-JEG-1

---

## BRIEF OF THE UNITED STATES

---

W. STEPHEN MULDROW
Acting United States Attorney

MICHELLE THRESHER TAYLOR
Assistant United States Attorney
Appellate Division

DAVID P. RHODES
Assistant United States Attorney
Chief, Appellate Division
Florida Bar No. 438741
400 N. Tampa St., Ste. 3200
Tampa, FL 33602
(813) 274-6000

April 14, 2017

*United States v. Aaron Richardson*
No. 16-14800-CC

**Certificate of Interested Persons
and Corporate Disclosure Statement**

In addition to the persons and entities identified in the Certificate of
Interested Persons and Corporate Disclosure Statement in Aaron Richardson's
principal brief, the following persons have an interest in the outcome of this
case:

1.     Muldrow, W. Stephen, Acting United States Attorney; and

2.     Thresher Taylor, Michelle, Assistant United States Attorney.

No publicly traded company or corporation has an interest in the
outcome of this appeal.

## Statement Regarding Oral Argument

The United States does not request oral argument. The facts and legal arguments are adequately presented in the briefs and record, and the decisional process will not be significantly aided by oral argument. *See* 11th Cir. R. 34-3(b)(3).

# Table of Contents

Certificate of Interested Persons and Corporate Disclosure Statement......... C-1

Statement Regarding Oral Argument ................................................................. i

Table of Contents ............................................................................................. ii

Table of Citations ........................................................................................... iv

Statement of Jurisdiction .............................................................................. viii

Statement of the Issues .................................................................................... 1

Statement of the Case ...................................................................................... 1

    *Course of Proceedings* ............................................................................... 2

    *Statement of the Facts* ................................................................................ 3

    A.    The attempted murder of Judge Corrigan ...................................... 3

    B.    The two years leading up to the shooting ..................................... 6

    *Standard of Review* ................................................................................. 21

Summary of the Argument ............................................................................. 22

Argument and Citations of Authority ........................................................... 25

    I.    The district court did not err in denying Richardson's
        motion to suppress the statements that he had made
        following his arrest because, as the court found, he had
        received *Miranda* warnings and then agreed to talk; but, in
        any event, the admission of those statements was harmless
        as to virtually all of his convictions ............................................ 25

II.    The district court did not err in denying Richardson's motion to suppress the cell-site information that the United States obtained via a court order under the Stored Communications Act because, as this Court has held, no warrant is required ............................ 35

III.    The district court did not err in denying Richardson's motion for a judgment of acquittal on false-statements counts 10 and 21 because the evidence sufficiently proved that those statements were false and material............................. 37

A.    Count 10 ............................................................................. 37

B.    Count 21 ............................................................................. 42

IV.    The district court did not clearly err in finding at sentencing that Richardson had obstructed justice by making false statements to the FBI during the investigation into Judge Corrigan's attempted murder ...................................................... 46

Conclusion..................................................................................................... 52

Certificate of Compliance with Type-Volume Limitation

Certificate of Service

# Table of Citations

## Cases

*Berghuis v. Thompkins,*
  560 U.S. 370 (2010) ............................................................25–27

*Coleman v. Singletary,*
  30 F.3d 1420 (11th Cir. 1994)................................................ 29

*Colorado v. Connelly,*
  479 U.S. 157 (1986) .............................................................. 29

*Fish v. Brown,*
  838 F.3d 1153 (11th Cir. 2016)............................................. 25

*Hall v. Thomas,*
  611 F.3d 1259 (11th Cir. 2010)............................................. 31

*Lox v. CDA, Ltd.,*
  689 F.3d 818 (7th Cir. 2012)................................................. 41

*McKlemurry v. United States,*
  478 F.2d 1185 (5th Cir. 1973)............................................... 34

*Miranda v. Arizona,*
  384 U.S. 436 (1966) ...................................................... *passim*

*Moran v. Burbine,*
  475 U.S. 412 (1986) .............................................................. 29

*United States v. Acosta,*
  363 F.3d 1141 (11th Cir. 2004)............................................. 29

*United States v. Arbane,*
  446 F.3d 1223 (11th Cir. 2006)............................................. 44

*United States v. Barbour,*
  70 F.3d 580 (11th Cir. 1995)................................................. 29

*United States v. Bervaldi,*
  226 F.3d 1256 (11th Cir. 2000)............................................. 21

*United States v. Boffil-Rivera,*
   607 F.3d 736 (11th Cir. 2010).................................................................37, 42

United States v. Bowers,
   811 F.3d 412 (11th Cir.), *cert. denied*, 136 S. Ct. 2401 (2016)...................... 45

United States v. Cameron,
   699 F.3d 621 (1st Cir. 2012) ....................................................................... 35

United States v. Crisci,
   273 F.3d 235 (2d Cir. 2001) ....................................................................... 50

*United States v. Davis,*
   785 F.3d 498 (11th Cir.), *cert. denied*, 136 S. Ct. 479 (2015)...................22, 36

United States v. Doe,
   661 F.3d 550 (11th Cir. 2011)...................................................................... 51

*United States v. Edwards,*
   303 F.3d 606 (5th Cir. 2002)........................................................................ 49

United States v. Evans,
   473 F.3d 1115 (11th Cir. 2006) .................................................................... 22

United States v. Farris,
   77 F.3d 391 (11th Cir. 1996)........................................................................ 21

United States v. Gafyczk,
   847 F.2d 685 (11th Cir. 1988)...................................................................... 42

United States v. Massey,
   443 F.3d 814 (11th Cir. 2006)...................................................................... 22

*United States v. Mathis,*
   186 F. App'x 971 (11th Cir. 2006) ............................................................... 49

United States v. McPhee,
   336 F.3d 1269 (11th Cir. 2003).................................................................... 21

United States v. Mills,
   138 F.3d 928 (11th Cir. 1998)...................................................................... 44

v

*United States v. Neder*,
  197 F.3d 1122 (11th Cir. 1999) ................................................................. 42

*United States v. Peters*,
  403 F.3d 1263 (11th Cir. 2005) ................................................................. 45

*United States v. Sparks*,
  806 F.3d 1323 (11th Cir. 2015), *cert. denied,* 136 S. Ct. 2009 (2016) ............. 22

*Waldrop v. Jones*,
  77 F.3d 1308 (11th Cir. 1996) ................................................................... 30

*Williams v. McNeil*,
  557 F.3d 1287 (11th Cir. 2009) ................................................................. 33

**Statutes**

18 U.S.C. § 912 ............................................................................................ 3

18 U.S.C. § 922(g)(1) ................................................................................... 2

18 U.S.C. § 922(j) ........................................................................................ 2

18 U.S.C. § 922(u) ....................................................................................... 2

18 U.S.C. § 924(a)(2) ................................................................................... 2

18 U.S.C. § 924(c) ....................................................................................... 2

18 U.S.C. § 924(i)(1) .................................................................................... 2

18 U.S.C. § 1001 ....................................................................................... 2, 3

18 U.S.C. § 1001(a)(2) ................................................................................ 37

18 U.S.C. § 1113 .......................................................................................... 2

18 U.S.C. § 1114 .......................................................................................... 2

18 U.S.C. § 2703 ........................................................................................ 35

18 U.S.C. § 2703(a) .................................................................................... 36

18 U.S.C. § 2703(c) .................................................................................... 36

18 U.S.C. § 2703(d) ........................................................................... 36

18 U.S.C. § 3146 ................................................................................. 2

18 U.S.C. § 3147(1) ............................................................................ 2

18 U.S.C. § 3231 ............................................................................. viii

18 U.S.C. § 3742(a) ........................................................................ viii

28 U.S.C. § 1291 ............................................................................. viii

**Rules**

Fed. R. App. P. 4(b) ....................................................................... viii

**Other Authorities**

*USSG §3C1.1 ...........................................................................46, 47

*USSG §3C1.1, comment. (n.4) ...............................................49, 50

USSG §3C1.1, comment. (n.4(C)) ................................................ 50

USSG §3C1.1, comment. (n.4(D)) ................................................ 49

USSG §3C1.1, comment. (n.4(E)) ................................................ 50

USSG §3C1.1, comment. (n.4(H)) ................................................ 51

USSG §3C1.1, comment. (n.5) ...................................................... 49

USSG §3C1.1, comment. (n.5(B)) ................................................ 49

USSG §3C1.1, comment. (n.6) ...................................................... 48

## Statement of Jurisdiction

This is an appeal from a final judgment of the United States District Court for the Middle District of Florida in a criminal case. The district court had jurisdiction. *See* 18 U.S.C. § 3231. It entered judgment against Aaron Richardson on June 28, 2016, Doc. 183, and Richardson timely filed a notice of appeal on July 7, 2016, Doc. 185. *See* Fed. R. App. P. 4(b). This Court has jurisdiction over this appeal, *see* 28 U.S.C. § 1291, and authority to examine Richardson's challenges to his sentence, *see* 18 U.S.C. § 3742(a).

## Statement of the Issues

I.    Did the district court err in denying Richardson's motion to suppress the statements that he made after having been given *Miranda* warnings?

II.   Did the district court err in denying Richardson's motion to suppress the cell-site information that the United States obtained via a court order under the Stored Communications Act?

III.  Did the district court err in denying Richardson's motion for a judgment of acquittal on false-statement counts 10 and 21?

IV.   Did the district court clearly err in finding at sentencing that Richardson had obstructed justice by making false statements to the FBI during the investigation into the attempted murder of a federal judge?

## Statement of the Case

Aaron Richardson attempted to murder United States District Judge Timothy J. Corrigan. He lay in wait outside of Judge Corrigan's home with a high-powered rifle, took aim through a window, and fired a shot that just barely missed Judge Corrigan's head. Richardson was convicted after a trial of numerous charges related to that attempted murder; he now challenges his convictions and sentence on several grounds.

1

## *Course of Proceedings*

In September 2013, a federal grand jury indicted Aaron M. Richardson on numerous charges related to his attempted murder of United States District Judge Timothy J. Corrigan: attempting to murder a United States officer or employee on account of his official duties (18 U.S.C. §§ 1113, 1114, and 3147(1))[1] (count 1); using, carrying, and discharging a firearm during and in relation to a crime of violence (18 U.S.C. §§ 924(c) and 3147(1)) (count 2); possessing a firearm and ammunition after having been convicted of a felony (18 U.S.C. §§ 922(g)(1), 924(a)(2), and 3147(1)) (count 3); possessing a stolen firearm (18 U.S.C. §§ 922(j), 924(a)(2), and 3147(1)) (count 4); making false statements to the FBI (18 U.S.C. §§ 1001 and 3147(1)) (counts 5 through 10); stealing a firearm from a licensed firearm dealer (18 U.S.C. §§ 922(u), 924(i)(1), and 3147(1)) (count 11); failing to appear for a federal-court hearing (18 U.S.C. §§ 3146 and 3147(1)) (counts 12 and 13); making false statements to the United States Probation Office while on release (18 U.S.C. §§ 1001 and 3147(1)) (counts 14 through 19); making false statements to the United States

---

[1]Section 3147(1), which is incorporated into many of the charged counts, prescribes an additional, consecutive sentence of up to ten years' imprisonment if the defendant committed the charged felony offense while on release pending trial, sentencing, or appeal.

Probation Office (18 U.S.C. § 1001) (counts 20 through 24); and impersonating an officer of the United States (18 U.S.C. § 912) (count 25). Doc. 1.

The judges of the Middle District of Florida recused themselves because Judge Corrigan sits on that court, and the case was assigned instead to a district judge from the Northern District of Alabama and a magistrate judge from the Southern District of Georgia. Docs. 2, 3; *see* Doc. 199 at 99–100.

Richardson pleaded not guilty. Doc. 52. He moved to suppress a variety of evidence and statements, Docs. 63, 64, 66, including—as relevant to this appeal—statements he had made at the Jacksonville Sheriff's Office following his arrest on a separate failure-to-appear charge. After an evidentiary hearing, *see* Doc. 122, the magistrate judge recommended that the district court deny the motion to suppress those statements. Doc. 124 at 23–26. (The judge did recommend that the district court suppress unwarned statements that Richardson had made at the hospital following his arrest. Doc. 124 at 21–23.) Richardson objected to the R&R and the United States responded. Doc. 130 and Doc. 134 (both under seal). But the district court overruled those objections and denied the motion to suppress Richardson's statements, other than those he had made at the hospital. Doc. 135.

Richardson went to trial, at which the jury found him guilty of every count other than one false-statement count (count 22). Doc. 168. The district

court sentenced him to spend the rest of his life in prison—a total of 4,116 months. Doc. 183. This appeal followed. Doc. 185.

## Statement of the Facts

### A.    The attempted murder of Judge Corrigan.

On the night of June 23, 2013, the Corrigans had just returned home from a wedding. Doc. 198 at 65. Judge Corrigan—United States District Judge Timothy J. Corrigan—had settled into an easy chair in their family room. Doc. 198 at 67. Mrs. Corrigan sat nearby, and they talked about a TV show that was on. Doc. 198 at 67–68.

As the Corrigans engaged in that seemingly insignificant conversation, one of the countless moments that comprise a thirty-year marriage, Aaron Richardson was waiting in the bushes outside their family-room window. *See* Doc. 198 at 68. Richardson had a plan—he called it *Mission Freedom*—that he hoped would bring an end to the supervised release he was then serving and resolve his other legal problems as well. And he had a rifle. *See* Doc. 199 at 128–29, 154–55, 262–66, 358.

As Judge Corrigan sat in that chair, Richardson raised the rifle, peered through its scope, and aimed at Judge Corrigan's head. Richardson was 48 feet away. Doc. 198 at 68, 120. He fired the rifle—a Savage Arms 30-06—sending a round into the family room. Doc. 198 at 68, 120; Doc. 199 at 19, 346. The

4

bullet hit the bottom of the window frame, rather than the window itself, and as a result missed Judge Corrigan's head. *See* Doc. 202 at 198, 227–30. (As a firearms expert later explained, Richardson had failed to account for the 1.6-inch difference between his sight line through the scope and the rifle's bore line. Because he was so close to the house, the bullet was still travelling below his line of sight when it reached the house, so even though he was looking through the window at Judge Corrigan's head, the bullet hit the window frame beneath his sightline. Doc. 202 at 197–204.)

Although the bullet missed its target, shards of metal from the window frame struck Judge Corrigan's head and forearm, wounding him. *See* Doc. 198 at 179–80; Doc. 202 at 268. Had Richardson aimed correctly, the shot likely would have hit Judge Corrigan's head, killing him instantly. Doc. 202 at 213–15.

Mrs. Corrigan immediately thought of gunfire. Doc. 198 at 69–71; Doc. 202 at 263–66. Judge Corrigan—possibly dazed and with his head and forearm bleeding—was unsure. Doc. 198 at 71; Doc. 202 at 263–66. But they both knew something was very wrong, and they called 911. Doc. 198 at 76; Gov't Ex. 1. The police were on the scene within minutes. Doc. 198 at 82. Judge Corrigan—still unwilling to believe what had happened—asked a lieutenant whether there was any explanation other than the apparent one. Doc. 202 at

5

279. The lieutenant responded, "No, Your Honor. Somebody tried to shoot you and kill you." Doc. 202 at 279.

The police located the shooter's lair in the bushes near the Corrigans' side yard, some 35 feet from the window. Doc. 198 at 164, 174. And there they found a shoeprint on the ground and some black electrical tape stuck on the bushes. Doc. 198 at 164–67. The bullet that Richardson had shot was found lodged in the family-room closet. Doc. 199 at 14–16.

## B.    The two years leading up to the shooting.

Judge Corrigan was no stranger to Richardson. A few years earlier, in March 2011, Judge Corrigan had sentenced Richardson to time served and three years of supervised release, after Richardson had pleaded guilty to a federal offense. Gov't Ex. 18; Doc. 202 at 289.

A year later, Richardson was attending Bethune-Cookman University in Daytona Beach. Doc. 200 at 240. His probation officer contacted the university after Richardson had failed to meet with him as scheduled. Doc. 200 at 240–44. (Richardson had already tried, unsuccessfully, to convince the probation officer that probation officers were not allowed on campus. Doc. 200 at 240–41.) The university, which has a policy against students who were on probation or other supervision, began evaluating Richardson's status. Doc. 200 at 246.

Richardson did not take the news lightly: he angrily demanded that the probation officer fix things at the university. Doc. 200 at 246–47. But Bethune-Cookman suspended Richardson, and Richardson moved back to Jacksonville. Doc. 200 at 247, 253.

A few weeks later, Richardson sent Bethune-Cookman a sham letter, purportedly from a Navy captain, insisting that Richardson had no criminal record and that he actually was a Navy Master Sergeant on a secret mission at the school; the letter demanded that the school clear Richardson's school record and re-enroll him. Doc. 200 at 257–62, 271–80; Gov't Ex. 70. That didn't work. Doc. 200 at 263–64.

Nonetheless, Richardson told his new, Jacksonville-based probation officer, Sally Watson, that Bethune-Cookman had lifted the suspension and he was back in school. Doc. 200 at 320–23. He also pleaded with her to do whatever she could to end his supervised-release term, so he could get on with his life: he just wanted to be "free completely," he wanted his "life back and not someone standing on it," and he wanted to be "free like the other kids." Doc. 200 at 321–22; Gov't Ex. 52, 53. She instead confirmed for him that Bethune-Cookman *had not* lifted his suspension; he responded by becoming very angry and confrontational. Doc. 200 at 325–26.

7

The very next day, July 24, 2012, Richardson bypassed Probation Officer Watson and delivered a letter to Judge Corrigan: *"Dear Judge Corrigan: I am in desperate need of your help. ... Please allow me early termination of probation and free me. My future depends on this. I want to be free like my next breath ...."* Doc. 200 at 327–34; Doc. 202 at 294; Gov't Ex. 71. Richardson said in the letter that he had been on a full scholarship and that he had good grades, but had had to leave school because Bethune-Cookman considered Probation Officer Watson a "security threat." *Id.* (In truth, as mentioned above, Richardson had been forced to leave school due to his supervised-release status.) A week later, Richardson filed that letter with the district court, this time as a "Motion to end Federal Probation." Gov't Ex. 72; Doc. 200 at 335.

Judge Corrigan spoke with Probation Officer Watson and told her that he would not be considering any change in Richardson's status at that time. Doc. 200 at 335; Doc. 202 at 295. On August 9, 2012, she again met with Richardson. Doc. 200 at 336. She gave him the unwelcome news, and again he got very angry. *Id*.

Meanwhile, though, Richardson was getting in trouble. Three times he burglarized buildings at Bethune-Cookman, in June, in October, and in November 2012. Doc. 200 at 289–300. He was arrested for the third burglary on November 30, 2012, and then for the first two burglaries on December 31,

2012. Doc. 200 at 300–02; Doc. 201 at 115–17, 123–24. He also was arrested in October 2012 for a burglary and theft in Jacksonville. Doc. 201 at 44–47; *see* Gov't Ex. 19 at 2.[2]

As part of his supervised release, Richardson was obligated to submit monthly reports to his probation officer. Doc. 201 at 8. In several of his reports (for October, November, and December 2012, for example), he answered *No* to whether he had been arrested or questioned by a law-enforcement officer during that month. Doc. 201 at 8–18; Gov't Exs. 86–90. But those statements were false: he had been arrested in each of those months. Doc. 201 at 9–18.[3]

In January 2013, Probation Officer Watson notified Judge Corrigan of Richardson's repeated violations of the conditions of his supervised release. Gov't Ex. 19; Doc. 199 at 61–63. She recommended that the court revoke Richardson's supervised release. *Id.* Richardson appeared before a magistrate judge on January 30, 2013. Doc. 199 at 69; Gov't Ex. 22. He denied having committed any of those crimes, and the judge released him pending a final hearing. Doc. 199 at 72–76.

---

[2]For simplicity, we have omitted some of Richardson's arrests while on supervised release.

[3]Richardson challenges the jury's finding that his December report was false. Richardson's brief at 36–37. We address that challenge in the Argument below.

Richardson then was arrested again, in March 2013, for theft and carrying a concealed weapon. Doc. 201 at 145–53; Gov't Ex. 85. As a result, he was brought back before the magistrate judge in April 2013. Doc. 199 at 87; Gov't Ex. 27. The judge declined to revoke Richardson's bond and allowed him to remain free. Doc. 199 at 94.

Then, in May 2013, the Probation Office filed a superseding revocation petition, which identified more violations. Doc. 199 at 79–83. Richardson was ordered to appear in court on June 3, 2013. Doc. 199 at 85; Gov't Ex. 25. Richardson also had court appearances pending in his state cases, for which he faced up to 40 years' imprisonment. Doc. 201 at 80.

Richardson did not show up in district court for his June 3 hearing, nor at the rescheduled, June 11 hearing. Doc. 199 at 85–86, 96–97; Doc. 200 at 351; Doc. 202 at 12. (Richardson claimed, falsely, that he had missed the first hearing because of a family funeral, and the second because of a serious bus accident. *See* Doc. 199 at 97–98; Doc. 200 at 88–90, 351–53.)

Instead, Richardson was researching Judge and Mrs. Corrigan. *E.g.,* Doc. 199 at 229–247. Between May 27 and June 14, 2013, he used a variety of internet search sites to uncover information on the Corrigans, including their home address and their home and cellphone numbers. Doc. 199 at 229–235, 237–47; Doc. 200 at 143–52; Gov't Exs. 36A–G; Gov't Exs. 36B-2–11, 14–15.

He also searched for information on big-game rifles and ammunition for big-game rifles. Doc. 199 at 235–37; Gov't Ex. 36B-12–13. And on June 11, the day he was supposed to be at his rescheduled district-court hearing, Richardson—or his cellphone, at least—was near the Corrigans' house. Doc. 200 at 61–62.

That same day, Richardson's mother—who had vouched for him in order to obtain his release—engaged in a flurry of text messages with him, expressing her concern and trying to convince him to go to court that day as scheduled. Doc. 199 at 252–65; Gov't Ex. 36E. He responded, "I'm safe. I said I'm not running, not in the least bit going to get freedom documents." Doc. 199 at 262; Gov't Ex. 36E at 5.

Richardson then texted his mother that an arrest warrant had been issued for his failure to appear, but he explained: "I gotta complete my mission, then I can come home free." Doc. 199 at 263; Gov't Ex. 36E at 5. Indeed, Richardson had placed an entry for *Mission Freedom* in his cellphone's "Contacts" list: the *Mission Freedom* phone numbers were the Corrigans'. Doc. 199 at 265–66; Doc. 202 at 277; Gov't Ex. P185.

Four days later, Richardson went to a Sports Authority store on the south side of Jacksonville. Doc. 199 at 334. He walked back to the gun department, where he talked to a store manager about rifles. Doc. 199 at 344–

11

46. (The store's video surveillance captured Richardson's interaction with the manager. Gov't Exs. 60A, 60B.) Richardson said he wanted a rifle for hunting and was specifically interested in two in-stock rifles with scopes, one of which was a Savage Arms 30-06. Doc. 199 at 345–46. The rifles were on a rack and secured by a cable that ran through their trigger guards, so the manager unlocked the cable to take the rifles down and show them to Richardson. *See* Doc. 199 at 370.

Five nights later, on June 20, Richardson went back to that Sports Authority, shortly before closing time. Doc. 199 at 355–62. But he didn't buy a rifle, or anything else; he instead hid out in the store until everyone had left, then crept back to that gun department. *Id.* (The store's video surveillance captured Richardson's presence at the store that night too. Gov't Exs. 61A, 61B, 61C.) Richardson stole the Savage Arms 30-06 rifle that he had looked at earlier and a twenty-round box of Winchester 30-06 ammunition. Doc. 199 at 358. (When the rifle was later found, its trigger guard—which is plastic—had been cut. Doc. 199 at 370; Doc. 200 at 174; Doc. 202 at 91. So, presumably, Richardson cut the trigger guard that night so that he could remove the rifle from the cable that had secured it.) He then snuck out of the rear of the store. Doc. 199 at 356–58. It was about 1 a.m. *Id.*

12

Twenty minutes later, Richardson approached a stranger, Joshua Sizemore, at the Regency Square Mall, which was only a ten-minute walk from the Sports Authority. Doc. 200 at 107–08, 214–15. He asked to borrow Sizemore's cellphone, so he could call his mother and have her pick him up. Doc. 200 at 109–10. (This, even though Richardson had a cellphone of his own. Doc. 199 at 315.) Richardson's mother picked him up. Doc. 199 at 297–98.

Three days later, on the evening of June 23, 2013, Richardson went to the Tinseltown movie theater, which is about a half-hour walk from the Corrigans' house, and bought a ticket for the eight o'clock showing of *Now You See Me*. Doc. 200 at 113–15, 217–19; Gov't Ex. 64. But Richardson didn't go to the movies that night—he was instead setting up outside of the Corrigans' house, where, as discussed above, he tried to kill Judge Corrigan once the Corrigans had returned home.

After the shooting, Richardson went to a restaurant, Miller's Ale House, that was near his alibi movie theater. Doc. 200 at 217–19. Once again, he walked up to a stranger, this time Jabari Hall, and once again he asked to borrow a cellphone to call his mother for a ride. Doc. 200 at 120–23, 125. (Again, even though Richardson had a cellphone of his own. Doc. 199 at 315.) It was about 2 a.m. Doc. 200 at 122, 124.

13

Hall noticed that Richardson looked like he had just walked out of the woods. Doc. 200 at 122. (One route from the Corrigans' house to the Ale House went through some woods. Doc. 200 at 126–32.) And Richardson had a fresh cut around his right eye. Doc. 200 at 122, 126. That cut looked like "scope bite" or "scope kiss," the injury that a shooter can get from the recoil of a scoped rifle. Doc. 199 at 21, 146; Doc. 200 at 223. (Indeed, when an FBI firearms expert later happened to see a photo of Richardson taken shortly after the incident, *see* Gov't Ex. P169, he immediately recognized the injury to Richardson's eye as scope bite, so he called the FBI lab to ensure that they swabbed the rifle's scope for DNA. Doc. 199 at 21.) Richardson used Hall's phone to call his mother; he told her he had been at the movies, and, once again, she came and picked him up. Doc. 199 at 297–98, 315; Doc. 200 at 124.

The next day, after his failed attempt to kill Judge Corrigan, Richardson redoubled his efforts. He searched the internet for instructions on how to improve rifle accuracy and how to make a rifle silencer. Doc. 199 at 238–39, 247–51; Gov't Exs. 36B-16–22.

Meanwhile, a massive investigation into the shooting ensued. Doc. 200 at 157–60. Agents pored over the parties who had appeared before Judge Corrigan and developed lists of persons to be investigated further. Doc. 200 at

14

24–25. Many were immediately rejected; others got more attention. Doc. 200 at 26.

Richardson was on the list. Doc. 200 at 165. As mentioned above, he was then serving a term of supervised release that Judge Corrigan had imposed, and he had been trying, unsuccessfully, to get out from under that supervision. Doc. 199 at 18, 19; Doc. 202 at 289. He also was facing an arrest warrant due to his failure to appear at the June 11 hearing. Doc. 199 at 96–97.

On June 25, deputy marshals and police officers went to the apartment where Richardson lived with his mother, to arrest Richardson on the failure-to-appear warrant. Doc. 199 at 107–08. When they got there, though, Richardson refused to answer the door; he instead hid in the closet of his mother's bedroom. Doc. 199 at 114–20. The officers entered the apartment, and a K-9 dog found Richardson in that closet. *Id*. Richardson was hiding under a pile of clothes, and the dog bit him on the arm. Doc. 199 at 141. It was not a severe bite. Doc. 199 at 122. Richardson was removed from his mother's bedroom and taken into custody. Doc. 199 at 121.

The officers' protective sweep also included Richardson's bedroom. In plain view in the closet of his room, they found the Savage Arms rifle. Doc. 199 at 128–29, 154–55. They placed the rifle on the bed in that room and

15

announced to the other officers present that there was a gun in that room. Doc. 199 at 129–30; *see* Gov't Ex. P118.

Richardson was not allowed to go into his bedroom. Doc. 200 at 201. His K-9 wound was treated, and he was taken to the hospital, where his arm was checked out. Doc. 199 at 122.

Eventually, Mrs. Richardson arrived home and consented to the FBI's search of Richardson's bedroom. Doc. 200 at 208–10. Officers found in Richardson's bedroom closet 19 rounds of 30-06 projectiles: 7 in a plastic baggie and 12 more in a 20-round box. Doc. 199 at 164–73. They also seized several other things from that room, including Richardson's cellphone, other ammunition, bolt cutters, and a hatchet that also had some black electrical tape on it. Doc. 199 at 164–73, 206; Doc. 201 at 168; Gov't Exs. 36, 37, 49.

Agents also found in Richardson's bedroom a manila envelope containing an order that Richardson had created—an "Order Exoneration of Prior Chrages [*sic*]"—that purportedly would have absolved Richardson of seemingly every possible charge, traffic citation, or conviction—state or federal—that he had ever faced. Doc. 199 at 193–200; Doc. 200 at 208–10; Doc. 202 at 298–305; Gov't Ex. 45; *see also* Gov't Ex. 48 (a handwritten early draft of the sham order). But the agents took only a quick look at the order because it was with other legal documents; they were unaware of its

16

significance and thought it was just another legal document. Doc. 200 at 209.
They left it in Richardson's bedroom. *Id*.

The rifle's plastic trigger guard had been cut, and the resultant gap covered with black electrical tape. Doc. 200 at 174; Gov't Ex. P119. (As mentioned above, the cut in the trigger guard had enabled Richardson to separate the rifle from the cable that had secured it at the Sports Authority. *See* Doc. 199 at 370; Doc. 200 at 174; Doc. 202 at 91.) The rifle's caliber matched the caliber of the bullet found in the Corrigans' home, and the rifling on the rifle's barrel matched the rifling on the bullet. Doc. 202 at 58–73. That unusual rifling is found on only two other rifle models in the FBI's entire vast database. Doc. 202 at 73. And Richardson's DNA was on the rifle's scope. Doc. 202 at 141–42.

The electrical tape that had been found in the Corrigans' side yard matched the tape on the rifle's trigger guard and the tape on the hatchet: all were visually and chemically the same. Doc. 201 at 173–200. And the shoes that Richardson was wearing when he was arrested—Nike running shoes, size 13—may have been the source of the shoeprint found on the Corrigans' side yard. Doc. 201 at 220–35; see Gov't Exs. 91A and 91B. (The bolt cutters found at Richardson's apartment may or may not have been used to cut through the trigger guard; tests were inconclusive. Doc. 202 at 91–92.)

17

Richardson allowed the FBI to interview him at the hospital. Doc. 122 at 65–66. Later that evening, he was taken to the Jacksonville Sheriff's Office. Doc. 122 at 65, 168–69. FBI Special Agents Logan and Silverstein met with him there. *Id*. at 171. (The interview was video-recorded. *Id*. at 171. The recording of the entire interview is government exhibit 65A; it was government exhibit 24 at the suppression hearing. Government exhibit 24A at the hearing was selected portions related to Richardson's *Miranda* waiver. *See* Doc. 122 at 171–72.)

At the outset, Richardson was brought food to eat. *Id*. at 172–73. Agent Silverstein determined that Richardson, who had just been at the hospital, was not under the influence of drugs. *Id*. at 172. He confirmed that Richardson had been given only ibuprofen. *Id*. Agent Silverstein then recited Richardson's *Miranda* rights. *Id*. at 229; Gov't Ex. 65A (3:45–7:23). (The advice-of-rights form is government exhibit 19 from the suppression hearing.) Agent Silverstein also explained what *Miranda* meant, including that it was totally Richardson's decision whether he talked without a lawyer and that Agent Silverstein would stop asking questions if Richardson decided that he did not want to talk. Gov't Ex. 65A (17:00–18:00). Richardson responded by either nodding his head or saying "Yes" to each of the *Miranda* statements. *Id*. At the last one, though, Richardson instead shook the agents' hands, announcing that by shaking

18

someone's hand and looking them in the eyes, he could build trust between people. Doc. 122 at 176. He declined to sign the *Miranda* form. *Id*. at 177, 230. He said that he would answer their questions as well as he could. Gov't Ex. 65A (17:51–17:58).

Richardson asked Agent Silverstein if he could go home. Doc. 122 at 232–33. Agent Silverstein told him that he could not leave, given the outstanding arrest warrant for his failure to appear. Doc. 122 at 232. At no point in the interview did the agents pull their weapons, threaten Richardson, use any kind of force or violence against him, or promise him anything. *Id*. at 175.

To the agents, Richardson's thought process seemed coherent. *Id*. at 227; Doc. 200 at 182. He had good judgment as to the cause and effect of things and an understanding of why he was there. Doc. 122 at 227. He spoke freely with them for an extended period of time. Gov't Ex. 65A. They considered his waiver to be "clear and unequivocal." *Id*. at 233.

During that interview, Richardson said that he had been at his mother's apartment the entire time from June 22 to June 23, 2013. Doc. 200 at 192. He said that he had no knowledge of the Savage Arms rifle that had been found in the apartment. *Id.* He said that the bedroom where the rifle had been found was not his room. *Id*. He said that he did not know that someone had shot at

Judge Corrigan. Doc. 200 at 193. He said that the Volusia County authorities had shown him paperwork dropping the charges against him there. *Id.* And he said that, if his fingerprints were on the rifle, it was because he had touched the rifle while getting his shoes out of a pile of clothes and other items that the officers had gathered. *Id*. (Government exhibit 65B is a transcript of the portions of the interview in which Richardson made the charged false statements.)

Toward the end of the interview, Richardson said, "First of all, I know that recordings are admissible in court." Gov't Ex. 65A (2:05.20). He added, "I understand I can ask for an attorney but I haven't said anything incriminating." Doc. 122 at 178; Gov't Ex. 65A (2:05.00–2:05.35). Then he reiterated, "[W]ith that being said, I still have the opportunity to ask for an attorney." Gov't Ex. 24 (2:05:28).

A few days later, FBI agents searched the entire apartment, again with Mrs. Richardson's consent. They again found the sham order that Richardson had created, but Mrs. Richardson had moved it in the meantime, from Richardson's bedroom to a trash bucket under the kitchen sink. Doc. 199 at 193–200, 309–10; Doc. 202 at 298–305. They also found a sham "Order of Full Pardon to Any Charges," which, as the name suggests, purported to pardon Richardson wholesale. Gov't Ex. 47; Doc. 202 at 304–08.

Both sham orders bore the forged signature of Judge Corrigan. *Id.* And

Richardson had written down instructions for how he intended to get those

orders entered: the instructions directed the court staff to file the orders,

making them "completely official"; to then notify the state courts, the Florida

Department of Motor Vehicles, and Richardson himself; and to "then never

speak of these things or this person again no matter what." Gov't Exs. 45, 46;

*see* Doc. 202 at 306–07.

## *Standard of Review*

I.    This Court will uphold the district court's fact finding that

Richardson waived his *Miranda* rights unless that finding is "clearly erroneous,

but [will review] the application of law to that finding ... *de novo." See United

States v. Farris*, 77 F.3d 391, 396 (11th Cir. 1996). When considering a ruling on

a motion to suppress, this Court construes the facts in the light most favorable

to the party that prevailed below. *United States v. Bervaldi*, 226 F.3d 1256, 1262

(11th Cir. 2000). This Court gives substantial deference to the district court's

credibility determinations. *United States v. McPhee*, 336 F.3d 1269, 1275 (11th

Cir. 2003).

Even if the district court erred in denying a motion to suppress, this

Court must uphold the conviction if the error was harmless beyond a

reasonable doubt. *United States v. Sparks*, 806 F.3d 1323, 1334 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 2009 (2016).

II.     This Court will review de novo the legal issue whether a warrant was required to obtain cell-site data from Richardson's cellphone-service provider. *See United States v. Davis*, 785 F.3d 498 (11th Cir.) (en banc), *cert. denied*, 136 S. Ct. 479 (2015). Even if the district court erred in denying a motion to suppress, this Court must uphold the conviction if the error was harmless beyond a reasonable doubt. *Sparks*, 806 F.3d at 1334.

III.     This Court reviews de novo the district court's denial of a motion for judgment of acquittal. *United States v. Evans*, 473 F.3d 1115, 1118 (11th Cir. 2006).

IV.     In reviewing the imposition of an obstruction-of-justice enhancement at sentencing, this Court reviews "the district court's factual findings for clear error" and its "application of the Sentencing Guidelines to those facts *de novo.*" *United States v. Massey,* 443 F.3d 814, 818 (11th Cir. 2006).

## Summary of the Argument

I.     The district court did not err in denying Richardson's motion to suppress the statements that he made following his arrest. The agents disclosed to Richardson his *Miranda* rights, which he waived voluntarily, knowingly, and intelligently. He answered the agents' questions for about two hours, and he

acknowledged during that interview both his right to an attorney and his right to remain silent. Moreover, his interaction with the agents during that interview—which was video-recorded—demonstrates the validity of his waiver.

In any event, the admission of the evidence from that interview was harmless beyond a reasonable doubt, at least as to all of Richardson's convictions other than the false-statement counts that derived from that interview. Overwhelming evidence supported his convictions, and nothing gleaned from that interview—in which Richardson persistently denied having done anything unlawful—could have affected the outcome.

II.    The district court did not err in denying Richardson's motion to suppress the cell-site information that the United States obtained via a court order under the Stored Communications Act. That Act authorizes the issuance of an order without a showing of probable cause, and, as Richardson acknowledges, this Court has held, en banc, that no warrant is required because the act of obtaining that information is not a search. In any event, the admission of that evidence was harmless beyond a reasonable doubt.

III.    The district court did not err in denying Richardson's motion for a judgment of acquittal on counts 10 and 21, which charged him with having provided false statements to the FBI when he said that, if his fingerprints and

23

DNA were on the rifle, they got there when he reached into a pile of items at his mother's house (count 10), and when he reported to the Probation Office that he had not been arrested in December 2012 (count 21). Both statements were false: he had gotten his DNA on the rifle by using it in the attempted murder, and he had been arrested in December 2012. His statement to the FBI included material assertions of fact, not just hypothetical possibilities. As for the December report, the jury reasonably could and did infer that he had signed and submitted it after he had been arrested on December 31, 2012, notwithstanding his use on it of the "12/30" date.

IV.    The district court did not err—clearly or otherwise—in finding that Richardson had obstructed justice. Richardson repeatedly lied to the FBI during the investigation: he told them that he had been at his mother's apartment the night of the shooting and that he knew nothing about the shooting or the rifle found in his closet. Those false statements were material to the investigation. And those false statements properly authorized the obstruction enhancement, regardless of whether they had significantly obstructed the investigation, because Richardson was convicted of separate false-statement offenses based on those statements.

Richardson also made several other false statements that were intended to obstruct justice.

## Argument and Citations of Authority

I.  **The district court did not err in denying Richardson's motion to suppress the statements that he had made following his arrest because, as the court found, he had received *Miranda* warnings and then agreed to talk; but, in any event, the admission of those statements was harmless as to virtually all of his convictions.**

On the night that Richardson was arrested on his failure-to-appear warrant, FBI agents read him his *Miranda* warnings at the Jacksonville Sheriff's Office and then interviewed him. Richardson claims that he did not waive his *Miranda* rights and that, even if he did, his waiver was not voluntary, knowing, and intelligent. Richardson's brief at 13–20.[4] The district court, however, correctly found that Richardson had waived those rights and had done so voluntarily, knowingly, and intelligently.

A defendant may waive his rights to remain silent and to counsel, but the waiver must be voluntary, knowing, and intelligent. *Miranda v. Arizona,* 384 U.S. 436, 444 (1966). The waiver need not be express; "[a]n 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence." *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) (citation omitted).

---

[4]We cite to court filings' original pagination, as this Court has suggested, rather than to the pagination generated by the ECF header. *See Fish v. Brown*, 838 F.3d 1153, 1157 n.3 (11th Cir. 2016).

"Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id.* The same applies to the right to an attorney. *Id.* at 380.

Here, Agent Silverstein very clearly explained to Richardson his *Miranda* rights: that he had the right to remain silent, that anything he said could be used against him in court, that he had a right to an attorney, that an attorney would be provided if he could not afford one, and that he had a right to stop the questioning at any time. Gov't Ex. 65A (3.45–7.23); Doc. 122 at 229. Agent Silverstein explained what *Miranda* meant, including that it was entirely up to Richardson whether he talked without a lawyer and that Agent Silverstein would stop asking questions if Richardson decided that he did not want to talk. *Id.* Richardson responded to each of the *Miranda* statements by either nodding his head or saying "Yes." *Id.* At the last one, regarding whether he was willing to answer questions without a lawyer present, Richardson did not answer; he instead shook the agents' hands, announcing that, by shaking their hands and looking them in the eyes, they could build trust. Doc. 122 at 176. He said that he could not sign the *Miranda* form, *id.* at 177, 230, but that he would answer their questions as well as he could. Gov't Ex. 65A (17.40–17.58). And he did answer their questions, speaking freely with them for about

26

two hours. Gov't Ex. 65A; *see also* Doc. 122 at 230. Then, toward the end of the interview, he expressly confirmed his understanding of those rights by saying, "I understand I can ask for an attorney but I haven't said anything incriminating." Doc. 122 at 178; Gov't Ex. 65A (2:05.00–2:05.35).

As the video-recorded interview shows, therefore, Richardson received the *Miranda* warnings, and his words and conduct that evening demonstrated that, notwithstanding his refusal to sign the form, he had understood his *Miranda* rights and had waived them. Richardson does not argue that he was coerced into waiving his rights, and nothing in the record even hints at coercion or undue pressure. *See* Doc. 122 at 175.

Richardson's waiver was much more apparent than, say, that of the accused in *Berghuis*, who had merely heard the recitation of his rights and then decided to answer some questions after hours of unanswered questions. Yet even there, the Supreme Court held that Berghuis, who had "received and understood the *Miranda* warnings, and ha[d] not invoked his *Miranda* rights, waive[d] the right to remain silent by making an uncoerced statement to the police." *Berghuis*, 560 U.S. at 388–89. Nor hadBerghuis "invoke[d] his right to remain silent and stop the questioning." *Id.* Rather, "[u]nderstanding his rights in full, he waived his right to remain silent by making a voluntary statement to the police." *Berghuis*, 560 U.S. at 388–89.

27

Even more so here. As the magistrate judge explained, "[a]lthough Richardson refused to sign the form, ... his conduct after dispels any notion that this was an unequivocal invocation of his rights." Doc. 124 at 23. The magistrate judge noted that Richardson had immediately thereafter said that he would answer their questions as best he could and that he had then spoken for about two minutes, unprompted. *Id.* at 23–24. The judge pointed out Richardson's handshake with the agents to "build a bond of trust," along with his later statement that he knew he had had the right to an attorney but had not said anything incriminating, which further confirmed that he had waived his *Miranda* rights. *Id.* at 24. Given this record, the district court did not err in finding that Richardson had waived his *Miranda* rights.[5]

Richardson also argues that he could not have voluntarily, knowingly, and intelligently waived his rights, given his "history of mental health and evident confusion as to the ultimate waiver question." Richardson's brief at 17–18.

At the outset, there was no confusion about the waiver. Richardson knew that he did not have to talk, and he knew that he had a right to a lawyer.

---

[5]The magistrate judge did recommend that the district court suppress the unwarned statements that Richardson had made earlier, in the hospital after his arrest, and the district court adopted that recommendation. *See* Doc. 124 at 21–23; Doc. 135.

28

Agent Silverstein could not have been clearer, and Richardson himself repeatedly voiced his understanding. *See, e.g.,* Gov't. Ex. 24 (2:05.20–28). Richardson's only reticence was in his refusal to sign the waiver form, but that is a common occurrence when defendants validly waive their *Miranda* rights. *See, e.g., United States v. Acosta,* 363 F.3d 1141, 1154 (11th Cir. 2004) ("the Supreme Court's decision [and] a number of our decisions [ ] establish that an arrestee's refusal to sign a waiver of rights form is not enough to constitute an invocation of [the arrestee's *Miranda*] rights") (citing Supreme Court and Eleventh Circuit cases in support).

As for Richardson's mental-health issues, those issues have no bearing on the voluntariness of his *Miranda* waiver absent "coercion by an official actor." *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995) (citing *Colorado v. Connelly,* 479 U.S. 157, 169–70 (1986)). As discussed above, there was no coercion here.

Mental-health issues can bear on whether a defendant waived his rights with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," *Moran v. Burbine,* 475 U.S. 412, 421 (1986); *see Coleman v. Singletary*, 30 F.3d 1420, 1426–27 (11th Cir. 1994). But here, there is "no evidence in the record that [Richardson's mental-health

29

issues] would have called into question his waiver of his *Miranda* rights."
*Waldrop v. Jones*, 77 F.3d 1308, 1318 (11th Cir. 1996).

In fact, Richardson's mental health was not even an issue at the hearing.
Richardson's motion challenging his statements made no mention of any
mental-health issues. *See* Doc. 66. At the suppression hearing, the only
mention of mental-health issues were Richardson's few vague questions to
Agent Logan about whether the agents had known during the interview about
Richardson's "mental health issues" or about the prosecutor's earlier statement
that those issues might lead Richardson to "do something." Doc. 200 at 225–
26.

As the circumstances discussed above show, Richardson knowingly and
intelligently waived his *Miranda* rights. He knew that the interview could be
used against him, he knew that he had the right to an attorney, and he knew
that he had the right to remain silent, yet he chose to talk to the agents. He was
not coerced, he was not placed in an oppressive environment, he was not
under the influence of drugs, he had been through the criminal process before,
he speaks English, and he has attended college. He responded to Agent
Silverstein's recitation of the *Miranda* rights, and he asked questions when he
wanted to. His own words during the recorded interview confirm that he
understood his rights and the significance of waiving those rights.

30

Furthermore, Richardson's false, exculpatory responses to the agent's many questions further confirms that he understood what he was doing. And he had had significant experience with *Miranda* warnings, due to his criminal history. *See, e.g.*, Doc. 201 at 47; Gov't Ex. 22 at 9–10.

Moreover, the video-recording of the entire two-hour interview provides some of the clearest evidence that Richardson fully understood the rights he was waiving and the consequences of doing so. *See Hall v. Thomas*, 611 F.3d 1259, 1288 (11th Cir. 2010) (suppression properly denied when "transcript and audiotape of [defendant's] confession give no indication whatsoever that [defendant] was confused or misunderstood the seriousness of the interrogation or the questions he was being asked").

In the face of all of this evidence supporting the district court's finding that he had waived his *Miranda* rights knowingly and intelligently, Richardson mentions his "psychological history" and the magistrate judge's earlier observation that Richardson sometimes acts "a little bizarre." Richardson's brief at 17. But those comments—which do not overcome the other evidence, in any event—concerned not Richardson's ability to understand matters before him; they concerned the possibility that Richardson might commit a crime if released (which he did) and the fact that Richardson sometimes falsely denies that he has committed crimes and falsely makes excuses for his failure to

31

appear in court (which he also did). *See* Doc. 130 at 14*.* Those comments did not call into question Richardson's ability to understand the waiver.

Richardson's sealed objections to the magistrate judge's report and recommendation did—for the first time—bring up mental-health issues. Doc. 130. But those issues did not relate to—let alone establish—Richardson's supposed inability to understand what he was waiving by talking to the agents, as explained in the United States' sealed response to those objections. Doc. 134. And that is especially so given all of the evidence before the district court showing that Richardson had knowingly and intelligently waived his *Miranda* rights.

Given all of that evidence, Richardson's argument seems in the end to be more that the district court did not specifically address or take into account the mental-health issue that Richardson had raised in his objections. Richardson's brief at 17–19. But that mental-health issue was directly before the district court in the form of both Richardson's objections to the magistrate judge's report and the United States' response to those objections. *See* Doc. 130 at 12–17 and Doc. 134 at 13–18. The district court explicitly considered those two documents in deciding whether to adopt the report and recommendation. *See* Doc. 135 at 2 (the court has "carefully reviewed and considered *de novo* all the materials in the court file, including the report and recommendation, the

defendant's objections thereto, and the Government's response").[6] Contrary to Richardson's assertion, then, the district court did consider the mental-health issue, and it correctly decided to deny the motion to suppress his statements, notwithstanding that issue, in light of all of the evidence that Richardson had voluntarily, knowingly, and intelligently waived his *Miranda* rights.

Finally, however, even if the district court had been wrong and Richardson's statements should have been suppressed, the admission of his statements was harmless beyond a doubt as to almost all of his convictions.

As outlined in the Statement of Facts above, the evidence of Richardson's guilt of the shooting and related crimes was overwhelming. The evidence showed that Richardson had developed a plan to obtain his "freedom," and that the plan entailed the entry of a sham Judge Corrigan order absolving Richardson and the elimination of Judge Corrigan to prevent him from challenging the sham order's authenticity. The evidence indisputably showed that Richardson had stolen a rifle and had used it to shoot at Judge Corrigan. The meticulous investigation—which linked a massive amount of inculpatory evidence directly to Richardson—left no doubt as to his guilt as to

---

[6]Although the district court did consider Richardson's new argument, the court had the discretion not to consider it, given that Richardson had not first presented it to the magistrate judge. *See Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009).

33

every charged crime that he had committed before that interview. No
reasonable juror could have reached any conclusion other than his guilt.

Moreover, Richardson's challenged statements, in which he attempted to
deflect responsibility from himself, added nothing of note to the evidence as to
any of those offenses. (Indeed, his facially exculpatory statements that night
were of note only because they conflicted with the overwhelming evidence
that, to the contrary, he had attempted to kill Judge Corrigan.) But even if his
statements had been independently incriminating, the incremental value of
those statements would have been so minimal that they could not have had
any effect on the jury's deliberations and guilty verdicts. Therefore, the failure
to suppress that evidence was harmless beyond a reasonable doubt.

That being said, the statements that Richardson made in the challenged
interview formed the basis for counts 5 through 10, which charged him with
having made false statements during that interview. *See* Doc. 1. The admission
of his statements was not harmless as to those counts, which would not have
existed absent that interview. So, if this Court were to agree with Richardson
on this suppression issue, those six counts—and those alone—would be subject
to reversal. *See McKlemurry v. United States*, 478 F.2d 1185, 1188 (5th Cir. 1973)
("We also note that the evidence of guilt on Counts II, III, IV, and V was
overwhelming. Assuming arguendo that error occurred in the admission of

some part of the evidence adduced as to Counts I, VI, and VII, such error was harmless beyond any reasonable doubt in respect to the convictions on the former counts."); *United States v. Cameron*, 699 F.3d 621, 627, 652–54 (1st Cir. 2012) (affirming counts of conviction as to which admission of evidence was harmless beyond a reasonable doubt, while reversing convictions to which evidence was not harmless).

In sum, because Richardson was informed of his *Miranda* rights and then waived those rights voluntarily, knowingly, and intelligently, this Court should affirm the district court's denial of the motion to suppress his statements.

## II.    The district court did not err in denying Richardson's motion to suppress the cell-site information that the United States obtained via a court order under the Stored Communications Act because, as this Court has held, no warrant is required.

Richardson argues that the district court should have suppressed the cell-site location information that the United States obtained via an order under the Stored Communications Act, 18 U.S.C. § 2703; he urges this Court to require instead a warrant based on probable cause. Richardson's brief at 21–23. But this Court's binding precedent holds otherwise.

The Stored Communications Act requires service providers to disclose non-content subscriber information if the United States first obtains a court order based on reasonable grounds to believe that the information is relevant

35

and material to an ongoing criminal investigation. 18 U.S.C. § 2703(c) and (d).

(A search for subscribers' *content* is treated differently and more stringently: it

requires a warrant. *See* 18 U.S.C. § 2703(a).) That is what the United States did

here: it obtained an order under the Stored Communications Act for cell-site

data (not content) about Richardson's phone. *See* Doc. 75 at 2.[7]

Richardson acknowledges this Court's precedent holding that no warrant

is required to obtain a service provider's historical cell-tower information. He

concedes, correctly, that *United States v. Davis*, 785 F.3d 498 (11th Cir.) (en

banc), *cert. denied*, 136 S. Ct. 479 (2015), is "adverse to this claim."

Richardson's brief at 22. *Davis* holds that no warrant is required to obtain non-

content cell-site data from a provider because a cellphone subscriber has no

reasonable expectation of privacy in that data. *Id*. at 511–13. *Davis* further

holds that, even if it were a search, it would be a reasonable one, given the

diminished privacy interest in the data and the procedural safeguards

employed by the Stored Communications Act. *Id.* at 516–18.

*Davis* binds this Court, as it did the district court. Therefore, the district

court did not err in denying Richardson's motion to suppress the cell-site data.

(In any event, the admission of that cell-site evidence at trial was harmless

---

[7]Richardson does not suggest that the United States lacked reasonable
grounds to believe that the information it sought was relevant and material to
an ongoing criminal investigation. Nor could he plausibly do so.

beyond a reasonable doubt, given its limited value in this case and the other, overwhelming evidence of Richardson's guilt. So reversal would not be warranted even if *Davis* had been decided differently and a warrant were required for this information.)

### III. The district court did not err in denying Richardson's motion for a judgment of acquittal on false-statements counts 10 and 21 because the evidence sufficiently proved that those statements were false and material.

Richardson challenges the guilty verdicts on counts 10 and 21, which charged him with having "knowingly and willfully [made a] materially false, fictitious, or fraudulent statement or representation" with respect to a matter within the jurisdiction of the United States. *See* 18 U.S.C. § 1001(a)(2).

A conviction under section 1001(a)(2) requires proof of five elements: (1) a statement, (2) falsity, (3) materiality, (4) a specific intent to mislead, and (5) federal-agency jurisdiction. *United States v. Boffil-Rivera,* 607 F.3d 736, 740 (11th Cir. 2010). Richardson argues that the evidence on counts 10 and 21 did not establish that those statements were false or, as to count 10, that his statement was material. Richardson's brief at 30–40. He is incorrect.

### A.    Count 10

Count 10 charged that Richardson had violated section 1001 by telling the investigating FBI agents that, if his fingerprints or DNA were on the rifle, it

was because he had touched the rifle when he had retrieved his shoes from a pile of items on the day of his arrest. Doc. 1 at 6. In that exchange, Richardson had said, "As far as I know, you shouldn't [find my fingerprints on the rifle]." Gov't Ex. 65B at 8. (Gov't Ex. 65A is the recording itself.) He added that officers had piled a lot of items on the floor, including his shoes and "something that was black [with] like, a piece of rubber on the end of it," and that, when he retrieved his shoes from the pile, "I tell you no lie, psh, everything in that pile I touched." *Id.* at 9. He said that he didn't remember touching a rifle, but, "if I touched it, like I told you, it could've been there." *Id.* at 9. He said that one officer had told another to get Richardson some shoes and a shirt from the pile. *Id.* at 11. When the agent pointed out that the officer's actions would not have put Richardson's prints on the rifle, Richardson responded, "Yeah it would cause I couldn't see, I'm just grabbin' [in the pile]." *Id.* at 11. He added, "If my prints on there, they on there. Not any way I could tell you how cause I don't shoot guns." *Id.* at 11.

Then, Richardson gave a longer explanation about what he supposedly had done to the pile of items on the floor and how he supposedly might have touched the rifle: "[The officer] said, '[W]ell point to what's not yours—pick up what's not yours.' I didn't have no strength to pick anything up laying on the floor. I did, I had my hands reached out, and I reached, you know what

38

I'm saying, for different things. I said, whatever that's not mine. Some of the stuff I couldn't see: sleeping bags, clothes, boxes, shoes, you name it. The [curtain] rods I saw. I didn't see a gun, but there was something hard in there. It had a long type rod—it had a rubber back. It didn't feel like no gun and all I did was reach up under some sheets and stuf[f] and say, well I don't know what that is, I don't know what that is, where's my shoes at?" Gov't Ex. 65B at 12.

So, in this exchange with the FBI agents, Richardson said (1) that the officers had directed him to reach into and root around a pile of items on the floor, (2) that he had done that, (3) that he had felt in that pile something long and hard with a rubber-like end, and (4) that, if his fingerprints were on the rifle, that must have been how it happened because he does not shoot guns. *See* Gov't Ex. 65B at 8–12.

Richardson's story was false on its face, and his attempt to include the rifle in the story without actually acknowledging that it was a rifle or that he knew about the rifle was especially absurd. But, regardless, the evidence at trial demonstrated that none of that had happened. In truth, Richardson had been discovered in his mother's bedroom closet and then detained; the rifle was in Richardson's own bedroom closet and had then been placed on the bed in that room; Richardson did not go into his bedroom during (or, for that matter,

after) his arrest; and, as Special Agent Logan explained, no police officer would allow an arrestee to reach into a pile that contained a rifle in order to retrieve his shoes. *See* Doc. 200 at 193–94, 201. And, as Gov't Ex. P118 vividly shows, the rifle was simply lying on the bed; it was not hidden amidst a pile of items where it could have been inadvertently and unknowingly touched.

In sum, and contrary to Richardson's false statement, if his fingerprints or DNA were on that rifle, they were there because he had handled the rifle previously—not because of his fabricated story that he might have inadvertently touched the rifle in his bedroom after his arrest.

Richardson, however, argues that he did not tell the agents how his fingerprints or DNA *had gotten* on the rifle; he only speculated as to how that *might have* happened. Richardson's brief at 43. But his answers were not speculation, nor were they "hypothetical statements," Richardson's brief at 32. They were his statements of fact that his fingerprints and DNA had not gotten on the rifle in the obvious way, by his having at some point picked up the rifle or shot it (indeed, he already had said that he had never touched the rifle, Doc. 200 at 227), but rather through an inadvertent touching as he rifled through the pile following his arrest. Those statements were false because Richardson had never reached through a pile that contained the rifle, so that it *not* how his fingerprints or DNA would have gotten on the rifle. It does not matter that his

40

false statements were prefaced by an *if*. *Cf. Lox v. CDA, Ltd.*, 689 F.3d 818, 824 (7th Cir. 2012) (statement warning of possible attorneys' fees award—"[o]ur client may take legal steps against you and if the courts award judgement, the court could allow court costs and attorney fees"—was "false" because "the award of attorney fees was not a possible outcome").

Richardson also argues that his statement was not material. According to him, it was merely hypothetical and the agents didn't believe him anyway. Richardson's brief at 33–36. As explained above, though, Richardson's statement was not hypothetical: it encompassed several facts—all of which were lies—and, even though it relied on an assumption—that his fingerprints or DNA were on the rifle. In light of that, Richardson's statement boiled down to his insistence that there had been no other opportunity for his fingerprints and DNA to get on that rifle. That statement was actually and factually false, as demonstrated by the overwhelming evidence that Richardson had held that rifle in the Sports Authority, that he had carried it out of the Sports Authority, and that he had held it up to his shoulder, peered through its scope, and fired a round from it into the Corrigans' family room.

As for materiality, that is not measured by how successful a false statement is, so it does not matter that the agents did not believe Richardson's tale. A false statement is material if it has "a natural tendency to influence, or

41

[is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Boffil-Rivera*, 607 F.3d at 741. "[A] false statement can be material even if the decision maker actually knew or should have known that the statement was false" or "even if the decision maker did not actually rely on the statement." *United States v. Neder*, 197 F.3d 1122, 1128 (11th Cir. 1999); *see also United States v. Gafyczk*, 847 F.2d 685, 691 (11th Cir. 1988) ("[I]n order for a false statement to be material under § 1001, it need not be shown to have actually influenced the government.").

Here, Richardson's denial that he had ever touched the rifle—other than perhaps inadvertently on the day of his arrest—was material to the investigation into who had used that rifle to shoot at Judge Corrigan.

For these reasons, the evidence was sufficient for the jury to find Richardson guilty of Count 10, and the district court did not err in denying Richardson's motion for a judgment of acquittal on that count.

## B.    Count 21

Nor is there any merit to Richardson's challenge to the evidence supporting the guilty verdict on count 21. Count 21 charged Richardson with having made a false statement to his probation officer in his December 2012 Monthly Supervision Report when he stated that he had not been questioned or arrested by a law-enforcement officer in the month of December. Doc. 1 at

14. (The report is government exhibit 88.) In truth, Richardson had been arrested on December 31, 2012, on a Volusia County warrant for burglary. *See* Doc. 201 at 123–25.

Although Richardson's vow of no arrests in December was false, he claims that, because his signature on the report is dated "12/30/12"—the day before the arrest—the evidence does not show that he made or submitted a false statement. Richardson's brief at 36–40. (The probation office received the report on January 3, 2013, three days after Richardson's arrest.)

The jury, though, could reasonable infer that Richardson had backdated the report to December 30 to explain away his omission of the December 31 arrest. For one thing, Richardson states in that report that he had not been arrested "during the month" of December. Gov't Ex. 88 at 1. But he could not have known by December 30 if he had been (or would be) arrested during December—that month was not yet over. Richardson's decision to shorten that month in a way that just so happened to exclude his end-of-month arrest was telling.

Furthermore, Richardson had done the same thing the previous month: he had dated his November 2012 report "11/29/12," which just happened to be the day before he was arrested on November 30. *See* Doc. 201 at 17, 36; Gov't Ex. 87 at 4. (And, from the look of that report, Richardson may have

43

decided to backdate that report after he had started to date it: the "11/29" date that Richardson had written down overwrote a different date; it "may have been the 30th or a 3 at one point," Doc. 201 at 36. *See* Gov't Ex. 87 at 4.)

Additionally, the jury had before it vast evidence of Richardson's history of lies, obstructive conduct, and sham documents.

In the end, this was a jury question whether Richardson had backdated the December report, as the district court noted in denying Richardson's Rule 29 motion on this count. Doc. 202 at 312. Richardson argued his version to the jury, Doc. 203 at 64, and the prosecutor responded, Doc. 203 at 70–71. The jury was entitled to find from the evidence that Richardson had backdated the report. It was not required simply to accept Richardson's version of events, and that it is especially so given his history of deceit and given that his version was premised on his having sworn to something nonsensical: that he had survived December without an arrest even though December was not even over yet.

Stated differently, the jury was not required to leave its common sense at the jury-room door. *See United States v. Arbane*, 446 F.3d 1223, 1237 (11th Cir. 2006). It "just needed to find that [Richardson] knew the statements were false when [he] wrote them and that [he] meant to write them down." *United States v. Mills,* 138 F.3d 928, 936 n.8 (11th Cir. 1998). And, in evaluating the sufficiency of the evidence, this Court is "bound by the jury's credibility

44

determinations, and by its rejection of the inferences raised by the defendant."
*United States v. Peters*, 403 F.3d 1263, 1268 (11th Cir. 2005).

The jury also reasonably could have found that Richardson had *submitted* the report after his arrest. He was released on January 1, 2013. *See* Gov't Ex. 76D. That gave him the rest of that day (a holiday) and also January 2 to place the false report in the mail, thus enabling the Probation Office to receive it on January 3. The theoretical possibility that Richardson might have signed and mailed the form before his December 31 arrest does not change things. The jury need not exclude every reasonable hypothesis of innocence. *See United States v. Bowers*, 811 F.3d 412, 424 (11th Cir.), *cert. denied*, 136 S. Ct. 2401 (2016).

Because the jury reasonably could have found that Richardson had signed or submitted the false December report after he had been arrested, the jury was entitled to find Richardson guilty of count 21. The district court did not err in denying Richardson's motion for a judgment of acquittal on that count.

**IV.  The district court did not clearly err in finding at sentencing that Richardson had obstructed justice by making false statements to the FBI during the investigation into Judge Corrigan's attempted murder.**

Finally, the district court did not err—clearly or otherwise—in finding at sentencing that Richardson had obstructed justice.

The Probation Office recommended that the district court enhance Richardson's offense level by 2 under USSG §3C1.1 because Richardson had obstructed justice by providing false statements to the FBI agents, as charged in counts 5, 6, 7, 8, and 10. PSR ¶ 90. That enhancement applies if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation ... of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." USSG §3C1.1.

The district court found that Richardson had obstructed justice and enhanced his offense level. Doc. 190 at 9. The court said, "I believe that the defendant did, in fact, take actions and make statements in an effort to mislead the Federal Bureau of Investigation, particularly with regard to the investigation of the attempted murder of Judge Corrigan." Doc. 190 at 9. The court noted, specifically, that, when Richardson had provided his false alibi

46

(that he had been at his mother's apartment when the shooting took place), "there were several different things that he said that were just absolutely misleading in an effort to mislead law enforcement and get them on another trail rather than himself." *Id*.

Richardson, though, argues that the enhancement was improper because his statements did not "significantly obstruct or impede the official investigation into Judge Corrigan's shooting." Richardson's brief at 23. He is wrong.

Richardson's argument is based on the faulty premise that his false statements had to have actually hindered the investigation. *See* Richardson's brief at 23, 24, 25, 26, 27. But the enhancement applies also if a defendant "*attempted to* obstruct or impede the administration of justice with respect to the investigation ... of the instant offense," USSG §3C1.1 (emphasis added), as the district court pointed out at sentencing, Doc. 190 at 6.

Richardson's false statements to the FBI agents—that he had been at his mother's apartment at the time of the shooting; that he knew nothing about the rifle that was found in the apartment; that the bedroom where the rifle was found was not his bedroom; that he did not know that someone had shot at Judge Corrigan; and that, if his DNA or fingerprints were on the rifle, they had to have gotten there when he reached into a pile of items—were an attempt to

47

obstruct the investigation into the shooting at Judge Corrigan. And they were material because, "*if believed*, [they] would tend to influence or affect the issue under determination." USSG §3C1.1, comment. (n.6) (emphasis added).

The false statements did not have to hinder the investigation, and so the district court was not obliged to find explicitly that Richardson had actually hindered the investigation, contrary to Richardson's assertion at pages 25–26 of his brief. To the extent that Richardson is making a separate argument based on the supposed inadequacy of the court's findings, he never sought more specific findings from that court, so that argument would be reviewable only for plain error. He has not tried to satisfy, and cannot satisfy, that standard.

In any event, Richardson's false statements did hinder the investigation. For example, they delayed the authorities' discovery that Richardson had been at the movie theater and the ale house on the night of the shooting. As the United States explained in its sentencing memorandum, "[b]y the time agents learned Richardson's true whereabouts, though, surveillance footage no longer existed." Doc. 179 at 7–8.

As Richardson notes, the guideline commentary does state, by way of example, that the adjustment applies for "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded

the official investigation or prosecution of the instant offense," USSG §3C1.1, comment. (n.4(D)), and that an adjustment ordinarily is not warranted for "making false statements, not under oath, to law enforcement officers," USSG §3C1.1, comment. (n.5(B)). But the guideline commentary explains that the adjustment "also applies to any other obstructive conduct in respect to the official investigation, prosecution, or sentencing of the instant offense *where there is a separate count of conviction for such conduct*." USSG §3C1.1, comment. (n.4) (emphasis added); *see also* USSG §3C1.1, comment. (n.5) ("However, if the defendant is convicted of a separate count for such conduct, this adjustment will apply and increase the offense level for the underlying offense....").

As the Fifth Circuit has explained, the commentary's list of conduct that ordinarily is not covered "applies only absent conviction." *United States v. Edwards*, 303 F.3d 606, 646 (5th Cir. 2002). This Court has been equally explicit: a defendant's "separate count of conviction for making misleading statements to investigating authorities investigating the instant offense compel[s] the district court to apply section 3C1.1." *United States v. Mathis*, 186 F. App'x 971, 979 (11th Cir. 2006); *see also Edwards*, 303 F.3d at 646 ("The government correctly asserts that the obstruction enhancement was supported by Johnson's conviction on the false statements counts.") (citing Application

49

note 4); *United States v. Crisci,* 273 F.3d 235, 240 (2d Cir. 2001) ("In this case, Crisci's separate count of conviction for making false statements to the FBI agent investigating the instant offense compelled the district court to apply Section 3C1.1.") (citing Application note 4).

That is what happened here. Richardson was convicted of several offenses for the obstructive, false statements that he made to the FBI agents related to the shooting. *See* Docs. 1, 68. Those "separate count[s] of conviction for [obstructive] conduct" warranted the enhancement. *See* USSG §3C1.1, comment. (n.4). Because of those convictions, the obstruction enhancement applied regardless of whether Richardson's false statements to the FBI agents actually or significantly hindered the investigation.

Furthermore, and even aside from those lies to the FBI, Richardson engaged in other obstructive conduct that is expressly covered by the examples in commentary note 4. He fabricated a sham order that purported to exonerate him from his pending charges and presented it to Volusia County authorities. *See* USSG §3C1.1, comment. (n.4(C)) ("producing or attempting to produce a false, altered, or counterfeit document or record during than official investigation or judicial proceeding"). He willfully failed to appear at two revocation hearings addressed to the very supervised-release sentence that Judge Corrigan had imposed on him. *See* USSG §3C1.1, comment. (n.4(E))

50

("willfully failing to appear, as ordered, for a judicial proceeding"). And he lied to his probation officer about his failure to appear at one of those revocation proceedings. *See* USSG §3C1.1, comment. (n.4(H)) ("providing materially false information to a probation officer in respect to a presentence or other investigation for the court").

The Probation Office set out these four acts of obstruction as an alternative basis for the obstruction enhancement. PSR Addendum (Response to Richardson's Objection). Richardson, however, argues that these acts were "not linked in any way to the instant offense of conviction," which he says is the attempted-murder offense. Richardson's brief at 23, 28.

This Court has stated that the "relevant question is whether the obstructive conduct occurred during the investigation, prosecution, or sentencing of the offense of conviction or a closely related offense." *United States v. Doe,* 661 F.3d 550, 556 (11th Cir. 2011) (internal quotation marks omitted). At a minimum, Richardson's failure to appear at his revocation hearings were closely related offenses; after all, his motivation throughout *Mission Freedom* was to get out from under his supervised-release term and to avoid the consequences of his failure to abide by the conditions that Judge Corrigan had imposed. And so, also at a minimum, Richardson's lies to his probation officer about why he had not appeared at a revocation hearing were

51

obstructive conduct during the investigation of his (closely related) failure-to-appear offense. So the obstruction enhancement was warranted for this reason also.

In any event, as discussed above, the enhancement applies based on Richardson's false statements to the FBI that resulted in convictions. Therefore, for either of these reasons, or both, this Court should affirm the obstruction enhancement and Richardson's sentence.

## Conclusion

The United States requests that this Court affirm the judgment of the district court.

Respectfully submitted,

W. STEPHEN MULDROW
Acting United States Attorney

MICHELLE THRESHER TAYLOR
Assistant United States Attorney
Appellate Division

By:   *s/ David P. Rhodes*

DAVID P. RHODES
Assistant United States Attorney
Chief, Appellate Division
Florida Bar No. 438741
400 N. Tampa St., Ste. 3200
Tampa, FL 33602
(813) 274-6000
david.rhodes@usdoj.gov

## Certificate of Compliance with Type-Volume Limitation

This brief, which contains 12,142 countable words under 11th Cir. R.

32-4, complies with Fed. R. App. P. 32(a)(7)(B).

# Certificate of Service

I certify that a copy of this brief and the notice of electronic filing was sent by CM/ECF on April 14, 2017, to:

JOHN J. OSSICK, JR., ESQ.
MEREDITH JONES KINGSLEY, ESQ.

*Counsel for Aaron Richardson*

*s/ David P. Rhodes*
DAVID P. RHODES
Assistant United States Attorney